IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHARON DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:10cv904-WHA |
| | ) | |
| THE HOUSING AUTHORITY OF THE | ) | (wo) |
| CITY OF TROY, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #26), filed by the Housing Authority of the City of Troy, Alabama on October 14, 2011.

The Plaintiff filed a Complaint in this case on October 26, 2010, bringing claims for disparate pay on the basis of race and gender pursuant to Title VII of the Civil Rights Act of 1964, as amended (Count One), violation of the Equal Pay Act (Count Two), and disparate treatment on the basis of race in violation of 42 U.S.C. § 1981 (Count Three).

The Defendant has moved for summary judgment as to all of the claims against it.

For the reasons to be discussed, the Motion for Summary Judgment is due to be DENIED.

**II.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and   . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most

2

favorable to the non-movant:

Sharon Daniels ("Daniels") has been employed by the Defendant the Housing Authority of the City of Troy, Alabama ("the Housing Authority"), since January 4, 1994. She was originally hired as a tenant coordinator, and was promoted to occupancy clerk, then housing specialist, and finally Property Manager.

Ken Vaughan ("Vaughan") is the Housing Authority's Executive Director. The Housing Authority has a five member Board of Directors. The Housing Authority manages 422 units at five different locations.

In January of 2006, Vaughan announced a change in management structure for the Housing Authority as required by the Department of Housing and Urban Development. Under this structure, Vaughan recommended three Housing Authority employees to be Property Managers. These employees included Daniels, an African American woman; Bertha Batie ("Batie"), an African American woman; and Roger Green ("Green"), a white man. The three Property Managers have the same job title, same pay grade classification, and same job description. Daniels is responsible for 134 housing units, Green is responsible for 168 housing units, and Batie is responsible for 120 housing units. Batie does not have an assistant, whereas Green and Daniels have assistants. In January of 2006, Green's salary was $1569.31 per pay period, Batie's was $1532.91, and Daniels's salary was $1086.93.

In May 2006, Vaughan made a recommendation to the Board of Directors as to the salaries to be paid to three Property Managers, which were approved. The basis for Vaughn's recommendation as to the Property Managers's salaries is a central issue in this case. When asked in his deposition about the setting of the "original salary" for the positions, Vaughan stated

that he looked to see whether their salaries fell within the approved range for the position. Vaughan Dep. at p. 89: 13-16.  When asked why he assigned Daniels a salary at the bottom end of that range and Green at the top end, Vaughan answered that it was based on their "current salaries at that time."  *Id.* at p. 92.[1]

Vaughan recommended a pay raise for Daniels to $1250.00 per pay period, effective May 2006, after learning that an employee under Daniels's supervision was paid more than she was, and that recommendation was approved.  All three Property Managers received a 5% pay increase in 2006.  Arnold Decl. at ¶ 6.

Vaughan has stated in a Declaration that sometime in the fall of 2006 he and Linda Arnold ("Arnold"), the Comptroller, determined that two primary factors would be used in determining salary (1) whether the particular Property Manager had an administrative assistant, and (2) that the compensation would be based on the number of units managed.  In July or August 2008, a salary study was conducted to compare salaries to other housing authorities. According to Vaughan's Declaration, however, except for the adjustment of Daniels's salary in 2006, none of the Property Managers have received anything other than a percentage-based adjustment that applied to all employees.

## IV. DISCUSSION

### A. Disparate Treatment

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of race under Title VII and § 1981 by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v.*

---

[1] The Housing Authority's position on the context of this testimony is discussed below.

*Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).  That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case." *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

A prima facie case of disparate treatment in wages is established if the plaintiff demonstrates that (1) she belongs to a protected class, (2) she received lower wages, (3) a similarly situated comparator outside of the protected class received higher compensation, and (4) the plaintiff was qualified to do the job.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

The Housing Authority has argued that it is entitled to summary judgment on Daniels's disparate treatment claims because no similarly situated person was treated more favorably than

5

Daniels. The Housing Authority concedes that Green and Daniels, as well as Batie, were responsible for performing the same job functions and/or supervising the performance of those functions. *See* Doc. #37 at p.6. The Housing Authority states, however, that Green performs additional different duties than Daniels because he is responsible for 34 more units than Daniels. The Housing Authority also contends that Green has more responsibilities because he supervises five employees while Daniels supervises four.

Daniels responds there is no evidence that Green performs additional duties not performed by Daniels, or any evidence of the significance in time, effort, and importance of those duties. Daniels further contends that Angeline Blair ("Blair"), Green's assistant, identified Property Manager job duties that she never saw Green perform or complete in five years. In her deposition, Blair identifies several tenant-related duties, such as computing the total adjusted income for a tenant and verifying income, which she says she did not see Green perform. *See* Blair Dep. at p. 20.

The Eleventh Circuit has previously given guidance to courts in the evaluation of comparators under the more lenient Title VII standard, as compared to the EPA standard, which is the strictest standard of comparison applicable. *See Mulhall v. Advance Security, Inc.*, 19 F.3d 586 (11th Cir. 1994). In *Mulhall*, the plaintiff was a Vice President, Administration of a company. She brought EPA and Title VII wage claims. One of the comparators for these claims was hired to head up an investigations division of the defendant corporations and served as the president of that division. For purposes of the EPA claim, the Eleventh Circuit reasoned that both positions were corporate department heads, both positions reported to the president, job functions such as responsibilities regarding EEO, affirmative action, and coordination with other

corporate entities were identical. *Id.* at 593. The court concluded that, drawing all inferences in favor of the non-movant, it could not say that the administrative aspects of the positions were not substantially similar. *Id.* The court determined, however, that the investigative component of the comparator's job meant that the similarity requirement of the EPA was not met. *Id.* When the court examined the Title VII wage claim, the court explained that under the more lenient standard, a question of fact had been raised as to the similarity of positions because there was no evidence in the record as to the amount of time and effort the comparator actually expended on investigative supervision, and how much supervision entailed investigative experience, rather than general supervisory experience. *Id.* at 598. In other words, additional evidence was needed to demonstrate that additional duties sufficiently exceeded duties in common to render the comparator dissimilar.

The Eleventh Circuit has also explained that in a comparator analysis, "the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." *MacPherson v. University of Montevallo*, 922 F2d 766, 775 n.16 (11th Cir. 1991).

Similar to the evidence in the *Mulhall* decision, the evidence before the court does not establish the amount of time and effort actually expended on the additional 34 units to exceed time and effort expended on duties in common to render the comparator dissimilar. The position description for Property Manager identifies 55 major duties and responsibilities, at least some of which, such as verifying cash drawers, opening the vault, checking vendor prices, processing invoices for payment, keeping filing systems in accordance with Housing Authority and HUD

policy, and reporting suspected criminal activity, are not facially apparent as being affected by the number of units managed.  *See* Appx. A to Pl. Ex. #23.   More important, there is evidence in the form of Blair's testimony that Green was not performing some duties which arguably could require more time depending on the number of tenants, such as calculation of tenant income.  Therefore, there is a question of fact as to the extent, if any, of responsibility and duties he performed which were greater than that of Daniels.

A jury may ultimately conclude that the responsibility and requirements of the additional units renders Green dissimilar.   At this point, however, viewing the evidence in a light most favorable to the non-movant, the court concludes that Daniels has created a question of fact sufficient to establish a prima facie case.

The Housing Authority contends that even if Daniels establishes a prima facie case, Vaughan determined that an equitable way to compensate property managers was based on the number of units they manage and whether the Property Manager is assigned an Assistant Property Manager, and that was the basis for the difference in salary, not race or gender.

Daniels argues that Vaughan's explanation in his affidavit about how he set the salary for the Property Managers is in conflict with his deposition testimony.   Daniels states that in his deposition Vaughan testified that he set the pay based on previous salary, and that he did not consider whether the manager had an administrative assistant or the number of units managed.  Daniels states that prior salary, standing alone, is not a legitimate non-discriminatory reason, citing *Miranda*, 975 F.2d at 1530.  Daniels states further that the proferred explanation in Vaughan's affidavit is also internally inconsistent because the number of units managed explains only the discrepancy in pay between Daniels and Green, but not Daniels and Batie, and the lack

of assistant explains the discrepancy between Daniels and Batie, but not Batie and Green.

      The Housing Authority responds that Daniels has misinterpreted Vaughan's testimony. According to the Housing Authority, Vaughan made the decision to base salary on the number of units in 2006, and then in 2007 merely evaluated whether the salaries of each Property Manager were within the applicable range.  The Housing Authority states that the portion of Vaughan's deposition in which he states that he did not consider the number of housing units in recommending a salary refers to 2007.

      The court has reviewed Vaughan's declaration and the deposition excerpts cited, as well as the declaration of Arnold, the comptroller.  It appears to the court that there is a great deal of confusion in the evidence, and briefs, as to when salary determinations were made in this case, and the basis for those determinations.

      Both Vaughan and Arnold have stated that they made the decision that two factors would be used in determining salary: (1) whether there was an administrative assistant, and (2) that compensation would be based on the number of units managed.  Both Vaughan and Arnold have stated, however, that this determination was made in the fall of 2006. Although the effective date for the Property Manager positions was in 2007, the Property Manager positions were filled in January 2006, and a salary scale was approved by the Board in May 2006.  There is apparently no question that Daniels Property Manager salary was set in 2006, because Vaughan has stated in his Declaration that Daniels received a salary adjustment of 15% effective May 2006 because she was being paid less than someone she would supervise and that "she would not have received this increase had she not transitioned into the Property Manager role." Vaughan Decl. at ¶40. Arnold has stated in her Declaration that each of the three Property Managers received a 5%

9

increase in 2006. Arnold Decl. at ¶ 6.

There is no reason articulated in the brief, much less supported by citations to evidence, for the difference in salary as between Daniels and Green in May of 2006, other than the employees's existing salaries. The Housing Authority, has, therefore offered incomplete evidence, and has not provided a reason for the difference in salaries between Green and Daniels at the time of their appointment to the Property Manager's position.

Even if the court were to consider the Housing Authority to have satisfied its burden of articulating a legitimate, non-discriminatory reason, there are questions of fact presented as to Vaughan's actual reliance on the articulated reason. When Vaughan was asked in his deposition why he set Green's salary at the top of the applicable range and Daniels's salary at the bottom end, he answered that he looked at the "current salaries at that time." Vaughan Dep. at p.91:18-92:10. The Housing Authority contends that this salary determination occurred in 2007, after the decision was made in 2006 to base salary on the number of units assigned to the Property Manager. The question in the deposition, however, comes after a series of questions when Vaughan clarified that the questioner was asking about the "original salary" *id.* at p.89: 11-12, and "[w]hen we originally made the assignment." *Id.* at p.91:4. Vaughan's testimony on this point is unclear because he refers in his deposition to the "original" salary, but also uses the date 2007.[2] At an earlier point in Vaughan's deposition, however, it is clear that he made a recommendation as to salary at the time he recommended Daniels, Batie, and Green as Property Managers. When asked about the recommendation as to salary made "at the same time" as the

---

[2] In fact, the attorney questioning Vaughan uses the date 2007, but appears to be referring to the original appointment of Daniels as manager. *See* Vaughan Dep. at p.87: 8-13.

recommendation of the selection of Daniels, Green, and Batie, Vaughan stated that his recommendation was "[a]ll three of their salaries, from best I can remember, fell within the range for that position." *Id.* at p. 56: 17-20.  He testified that he cannot recall how he determined where the three employees fell within the range. *Id.* at p. 57 : 9-21.  The court concludes, therefore, that there is at least a question of fact as to what Vaughan considered in recommending the original Property Manager salaries in May 2006.

As noted above, Vaughan has stated that in the fall of 2006, he determined that the Property Managers should be paid in accordance with the number of units managed.  There is insufficient evidence before the court, however, that Vaughan changed any salaries in accordance with such a policy.  In its Reply, the Housing Authority states, citing only to a pay record of Daniels, that Daniels received a November 2006 pay increase consistent with the per unit calculation and Green and Batie did not receive that increase.  *See* Doc. #37.  Under this argument, Daniels would have received two salary adjustments in 2006 which were not received by Green and Batie: one in May 2006 and one in November 2006.  That argument is not supported by evidence beyond a citation to a listing of Daniel's paychecks.  Moreover, the Housing Authority's interpretation of the paycheck evidence appears to be inconsistent with Vaughan's Declaration.  In his declaration, Vaughan does not mention a November 2006 adjustment, but instead identifies a single unique salary adjustment for Daniels when he states that "[e]xcept for Ms. Daniels' 2006 adjustment, none of the Property Managers have received anything other than percentage-based adjustments . . . ." Vaughan Decl. at ¶ 49.[3]

---

[3] Arnold states in her Declaration that "Except for Plaintiff's 2006 adjustments, none of the Property Managers have received anything other than percentage based adjustments . . . ." Arnold Decl. at ¶13.  Earlier in her Declaration, Arnold refers to the May 2006 adjustment and

Viewing the evidence in a light most favorable to the non-movant, a reasonable jury could conclude that although a reason has been articulated for the difference in pay as between Daniels and Green, the original salary recommendation was based on the employees's early 2006 salary, and even though Vaughan has stated that he decided to rely on the number of units and access to an assistant in setting salaries, the salaries were not adjusted based on the number of units, but were only increased by uniform percentage increases.  The court concludes, therefore, that Daniels has created a sufficient question of fact to undermine the articulated reason so that she has established pretext, even if the Housing Authority has adequately articulated a legtimate, non-discriminatory reason for salary disparity.

It may ultimately be that a jury will conclude that neither race nor gender played a substantial or motivating role in the difference in pay as between Daniels and Green.   Given the incomplete evidence and the fact questions raised by Daniels as to how salaries were determined at various points, and what the basis for the admitted difference in salary between Green and Daniels is, the court cannot conclude that the Housing Authority is entitled to summary judgment on the gender and race disparate treatment claims.

## B.  Equal Pay Act

To establish a prima facie case under the Equal Pay Act, the Plaintiff must show that the employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions.  *See Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 795 (11th Cir. 1992).   A female employee demonstrates a prima facie case of an Equal Pay Act

---

the 5% increase.  *See id.* at ¶7.

violation by showing that her employer paid male employees different wages for equal work for jobs which require " 'equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)). A plaintiff need only demonstrate that the jobs at issue are substantially similar, not identical. *Miranda*, 975 F.2d at 1533.

Once the Plaintiff establishes a prima facie case, the burden then shifts to the Defendants to demonstrate that the differential was justified under one of the four affirmative defenses found in 29 U.S.C. § 206(d)(1). Defendants bear the burden of proof for these affirmative defenses. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995).

Although, as noted above, the similarity standard for Equal Pay Act claim is higher than that of a Title VII disparate wage claim, under the facts as presented at this point in the proceedings, the court concludes that the same incomplete evidence and questions of fact which preclude summary judgment as to the Title VII claims also precludes summary judgment as to the Equal Pay Act claim in this case. Again, while a jury may ultimately find in the Housing Authority's favor on the Equal Pay Act claim, at this point in the proceedings, the Housing Authority has not established that it is entitled to judgment as a matter of law.

## V. CONCLUSION

As noted above, the evidence presented by the movant is incomplete in many respects, and conflicting in others. It appears to the court that many of the questions of fact which have been raised in this case can be resolved simply through evaluation of more complete evidence on the issue of when the salaries at issue in this case were set, and when adjustments to those

salaries were made. Because that evidence is not currently before the court, however, and for the reasons discussed, the Motion for Summary Judgment is due to be and is hereby ORDERED DENIED.

Done this 7th day of December, 2011.

                                               /s/ W. Harold Albritton  
                                              W. HAROLD ALBRITTON  
                                              SENIOR UNITED STATES DISTRICT JUDGE